| | | |
|---|---|---|
| ROCHELLE A. GLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04 C 7237 |
| | ) | |
| JOHN E. POTTER, | ) | Judge John W. Darrah |
| Postmaster General of the United States, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rochelle Glen, filed suit against Defendant, John E. Potter as Postmaster General, for conduct arising during Glen's employment with the United States Postal Service. Count I alleges sexual harassment; Count II alleges disability discrimination, and Count III alleges retaliation. Presently before the Court is Defendant's Motion for Summary Judgment.

## BACKGROUND

In November 1997, Glen, a female African-American, began her employment with the Postal Service. (Def.'s 56.1(a)(3) Statement ¶ 1). In early 1998, Glen was assigned to the Ravenswood station as a part-time flexible letter carrier. (Id., ¶ 2). In January 1998, Gayle Campbell, a female African-American, became the Manager of Customer Services and Sales at the Ravenswood station. (Id., ¶ 3). On May 2, 1998, Supervisor Michael Henderson issued Glen a fourteen-day suspension for failure to deliver first-class parcels after Glen had been directed to do so. (Id., ¶ 5). The Lakeview station manger would not accept Glen as a carrier because he found her too unstable. (Plaint.'s 56.1(b)(3) Statement ¶ 27). In June 1998, Glen was transferred to the Division Street

station for one day to fill in for a carrier who had been beaten on his route. (Plaint.'s 56.1(b)(3) Statement ¶ 9; Def.'s 56.1(a)(3) Statement ¶66).

On July 24, 1998, Glen informed Campbell that she had stress because of her job. (Def.'s 56.1(a)(3) Statement ¶ 6). Glen asked Campbell if she could see an employee assistance counselor because she was suffering from job-related stress due to a paycheck she had received that was missing sixty hours of pay. The parties dispute whether Campbell allowed Glen to see the employee assistance counselor. (Id., ¶¶ 7-8; Plaint.'s 56.1(b)(3) Statement ¶ 1).

Glen alleges that during this time frame – January through July 1998 – Campbell sexually harassed Glen by certain conduct and comments. In May 1998, Campbell invited Glen to her home to swim. (Def.'s 56.1(a)(3) Statement ¶¶ 36-38). That same month, Campbell stated to Glen "Nigga, I own your ass." (Id., ¶ 40). In June 1998, Campbell called Glen into her office to look at a document. While Glen was standing in Campbell's office and she and Campbell were looking at the document, Campbell's breasts rubbed against Glen's back. (Id., ¶¶ 41-42). At another time, while Campbell and Glen were talking about delivering mail, Campbell told Glen, "Dogs can smell when a woman is on her period." (Id., ¶ 45). During the conversation, Campbell raised her dress and exposed her thigh and buttocks to show Glen a scar where a dog bit Campbell when she delivered mail while menstruating. (Id., ¶ 46). In one other instance that occurred while Glen picked up her paycheck from Campbell's office, Campbell exposed her thigh and stated to Glen, "Where do you get off making more money than me? I'm going to have to put a stop to that." (Id., ¶ 47).

On July 25, 1998, Supervisor Daryl Tate issued Glen a Letter of Warning because Glen failed to follow work instructions given by a supervisor. (Def.'s 56.1(a)(3) Statement ¶ 9). In August 1998, Glen was restricted to a forty-hour work week due to stress. Ravenswood management was

2

aware of the restriction. (Plaint.'s 56.1(b)(3) Statement ¶ 5). On August 21, 1998, Glen filed a Notice of Occupational Disease and Claim for Compensation ("Claim") with the United States Department of Labor for stress and anxiety. (Def.'s 56.1(a)(3 Statement ¶ 10). On August 29, 1998, Henderson issued Glen a seven-day suspension for the unauthorized deviation from assignment. (Id., ¶ 12). In September 1998, Glen was ordered to undergo a fitness for duty examination. (Id., ¶ 13). Glen was not found to be unfit for duty as a letter carrier. (Plaint.'s 56.1(b)(3) Statement ¶ 26). On November 17, 1998, Glen's Claim was denied; and that decision was upheld on an appeal. (Def.'s 56.1(a)(3) ¶ 14).

On February 15, 1999, LeVaughn Walton, a female African-American and manager of the Rogers Park station, issued Glen a fourteen-day suspension for failure to maintain regular attendance. (Def.'s 56.1(a)(3) Statement ¶ 17). On March 26, 1999, Clorinda Mitchell, a female African-American and supervisor, issued Glen a Notice of Removal for the unauthorized curtailment of mail. (Id., ¶ 18). On April 27, 1999, Supervisor Theresa Starr issued Glen a Notice of Removal for unscheduled absences. (Id., ¶ 19). On May 10, 1999, Glen was issued an Emergency Placement. (Id., ¶ 20). On May 11, 1999, Walton observed Glen was not performing her duties and put Glen on emergency leave. (Id., ¶ 69). That same day, Glen was physically removed from the Rogers Park station by the Chicago Police because Glen's behavior was considered a threat to government property and to the public. (Id., ¶ 23). While on assignment at the Rogers Park station, Glen suffered from panic attacks and received crisis and group therapy. (Plaint.'s 56.1(b)(3) Statement ¶ 29). Walton, Starr and Mitchell were aware of Glen's complaints of stress. (Id., ¶¶ 31-32).

On or about October 23, 1999, Glen was promoted to a full-time regular letter carrier and transferred to the Wicker Park station. (Def.'s 56.1(a)(3) Statement ¶ 25). As a full-time regular

3

carrier, Glen was allowed to bid on open vacancies for a permanent assignment. Glen did not bid for an open permanent assignment and was subsequently transferred to the Wicker Park station. (Id., ¶ 26).

On October 25, 1999, while working at the Wicker Park station, Glen refused to talk with her supervisor, Sherman Jones, a male African-American, at a meeting and was issued a Notice of Removal after the meeting. (Def.'s 56.1(a)(3) Statement ¶ 27).

On January 8, 2000, Jones observed that Glen was not performing her job duties. (Def.'s 56.1(a)(3) Statement ¶ 81). Eloise Murphy, another manager at the Wicker Park station, also observed Glen's inadequate job performance on January 8, 2000. Murphy authorized a mail count to see how productive Glen was performing her job. (Id., ¶ 77). Jones participated in the counting of Glen's assigned mail on January 8, 2000, and stated that a mail count is not a form of discipline. (Id., ¶ 82). Jones and Murphy also observed Glen's conduct on January 12, 2000, that led to disciplinary action being taken against Glen. (Id., ¶¶ 78, 83). On January 12, 2000, Glen was issued a Notice of Emergency Placement in Off-Duty Status for failure to follow instructions. (Id., ¶ 28). On January 14, 2000, Glen was issued a Notice of Removal for unacceptable conduct. (Id., ¶ 29). On January 26, 2000, Glen was given an official Letter of Emergency Suspension Pending Removal. (Id., ¶ 31). On February 12, 2000, Glen was put on leave-without-pay status. (Id., ¶ 32). In March 2000, Glen's employment with the Postal Service was terminated. (Id., ¶ 33).

Subsequently, Glen filed a grievance regarding her termination. On September 26, 2000, Glen's grievance was denied by the arbitrator after it was decided that Glen was terminated for just cause because of Glen's unacceptable conduct on January 10 and 12, 2000. (Def.'s 56.1(a)(3) Statement ¶ 34). Glen's January 10, 2000 conduct included returning from her assigned route with

a tub of mail, which Glen stated were "overs" for her route. Glen was instructed by a supervisor to work her overs before she ended her tour. Instead of following instructions, Glen placed the entire tub of mail on the "throwback case" and ended her tour. The tub was subsequently checked and found to contain deliverable mail. An employee was paid overtime to deliver the mail, and complaints were received from customers on Glen's route. On January 12, 2000, Glen reported to work and began wasting time by checking every piece of mail that had already been worked for her route. Glen was instructed by a supervisor to stop wasting time on mail that had already been worked for the street because Glen was delaying the working of first-class mail that was available for her route. Glen ignored the direction and continued checking the mail for over an hour. Management was required to replace Glen on her mail route and to pay other carriers overtime. More customer complaints were also received. (Def.'s Exh. 37 - Arbitrator's Report).

Glen's treating physician is Dr. Timothy Long. (Def.'s 56.1(a)(3) Statement ¶ 49). In August 1998, Glen was examined by Dr. Long. (Id., ¶ 50). During the examination, Glen reported extreme anxiety and stress. Dr. Long noted that Glen refused to see a psychologist or psychiatrist. (Id., ¶ 51). Dr. Long found that Glen could return to work and did not prescribe any medication. (Id., ¶ 52). Dr. Long treated Glen on October 1, 1998; November 13, 1998; December 9, 1998; and March 3, 1999. Dr. Long did not prescribe any medication for Glen at these subsequent examinations. (Id., ¶ 53). In the December 9, 1998 examination, Dr. Long noted that Glen reported that her stress and anxiety were caused by one manager, and not from her job. (Id., ¶ 54).

On November 12, 1998, Glen was examined by Dr. T.S. Wright, reporting anxiety. (Def.'s 56.1(a)(3) Statement ¶ 58). On April 28, 1999, Dr. Long examined Glen for stress and/or anxiety. At this time, Dr. Long prescribed the drug Buspar. (Id., ¶ 55). Glen does not take Buspar regularly

and only takes it when needed. (Id., ¶ 56). Glen could not indicate the regularity in which she takes Buspar. (Id., ¶ 57). Glen does not regularly see a doctor for her stress and anxiety. (Id., ¶ 60).

Following her termination from the Postal Service, Glen worked as "day laborer" for a business, for a business named Spherion, and for Kelly Temporary Services. (Def.'s 56.1(a)(3) Statement ¶ 63).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

### Sexual Harassment Claim

Sexual harassment, under Title VII, arises when conduct has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." *Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1143 (7th Cir. 2001) (internal quotation marks and citations omitted). A plaintiff must demonstrate that she or he was harassed because of their sex, *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir.

6

2000) (*Spearman*), and that the conduct was sufficiently severe or pervasive that it would be hostile to a reasonable person; and the victim must subjectively see it as abusive, *Hertzberg v. Sram Corp.*, 261 F.3d 651, 658 (7th Cir. 2001).

Title VII prohibits harassment "because of [the employee's] sex." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 78 (1998); 42 U.S.C. § 2000e-2(a)(1). In other words, the harassment must be directed at an individual because of their sex – male or female. *See Spearman*, 231 F.3d at 1084-85. Harassment based on sex can be shown by conduct that is motivated by sexual desire or a general animus towards a certain sex. *See Spearman*, 231 F.3d at 1085; *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999).

Glen alleges that she was sexually harassed by certain conduct and comments of Campbell over a several-month time period. The conduct and comments include: (1) Campbell invited Glen to her home to swim; (2) Campbell stated to Glen, "Nigga, I own your ass."; (3) Campbell's breasts rubbed against Glen's back one day when the two of them were reviewing a document; (4) Campbell made a comment about dogs knowing when a woman is menstruating and raised her dress and exposed her thigh and buttocks to show Glen a scar where a previous dog bit; and (5) Campbell exposed her thigh to Glen and stated to Glen, "Where do you get off making more money than me? I'm going to have to put a stop to that."

While the alleged conduct and comments may not be appropriate for a work environment, Glen has failed to demonstrate that the conduct and comments were directed at Glen because she was a woman or by a sexual desire. *See Spearman*, 231 F.3d at 1085-86 (use of sexually explicit comments and vulgar insults that resulted from work-related conflicts did not establish that plaintiff

7

was harassed because of his sex). Accordingly, Glen has failed to demonstrate a genuine issue of material fact exists as to whether she was harassed by Campbell because of her sex.

Furthermore, even if Glen had demonstrated that she was harassed because of her sex, the above conduct and comments were not sufficiently hostile or severe to constitute a hostile work environment.

Whether a work environment is sufficiently hostile or abusive is judged by looking at all of the circumstances, including: the severity of the conduct; the frequency of the conduct, whether it is humiliating or physically threatening or a mere offensive utterance; and whether it unreasonably interferes with a person's work performance. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-72 (2001) (*Breeden*). Offhand comments, simple teasing, and isolated incidents (unless extremely serious) do not amount to a hostile or abusive work environment. *Breeden*, 532 U.S. at 271.

Assuming that the alleged conduct and comments occurred – Campbell denies the conduct and comments – Glen has failed to demonstrate that these isolated occurrences which occurred over a several-month period were sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive working environment. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (ten offensive comments, only four of which were sexual in nature, over several months were insufficient to make work environment objectively offensive).

Rehabilitation Act Claim

To establish a *prima facie* case of a violation of the Rehabilitation Act, a plaintiff must show that she: (1) is disabled under the statute; (2) is otherwise qualified to perform the essential functions of the position, with or without accommodation; and (3) suffered an adverse employment action

8

because of the disability. *See Scheerer v. Potter*, 443 F.3d 916, 918 (7th Cir. 2006) (*Scheerer*). In light of the similarity of the Rehabilitation Act and the American with Disabilities Act ("ADA"), case law and standards of the ADA are applied to determine whether the Rehabilitation Act has been violated. *See* 29 U.S.C. § 794(d); *Sheerer*, 443 F.3d at 919; *Silk v. City of Chicago*, 194 F.3d 788, 798, n. 7 (7th Cir. 1999).

A disability is either (a) a physical or mental impairment that substantially limits one or more major life activities, (b) a record of such an impairment or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). The determination of whether a person has a disability is made on an individualized case-by-case basis. *Bryne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir. 1992). This determination is made through a three-step process: (1) whether the individual suffers from a "physical or mental impairment," (2) whether the life activity upon which the individual relies is a "major life" activity, and (3) whether the impairment "substantially limits" that major life activity. See *Bragdon v. Abbott*, 524 U.S. 624, 531 (1998).

A "mental impairment" includes "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). "[M]edically diagnosed mental conditions are impairments under the ADA." *Krocka v. City of Chicago*, 203 F.3d 507, 512 (7th Cir. 2000).

Glen has failed to demonstrate that she suffers from a "mental impairment." Glen's only evidence as to her disability is stress and anxiety due to her work. However, Glen was never diagnosed as having a mental impairment by her physicians or a psychologist or psychiatrist and refused to see a psychologist or psychiatrist. Glen merely relies on the doctors' findings of stress and

9

anxiety and her allegations that she had panic attacks and severe stress. Specific facts are required to demonstrate a disability; conclusory allegations are insufficient. *See Scheerer*, 443 F.3d at 919.

Working is a major life activity for purposes of the Rehabilitation Act. *See Mattice v. Memorial Hosp. of South Bend, Inc.*, 249 F.3d 682, 685-86 (7th Cir. 2001). Three factors are analyzed for determining whether a person's impairment substantially limits a major life activity: (1) the nature and severity of the impairment, (2) the duration of the impairment, and (3) the permanent or long-term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *Furnish v. SVY Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001). The positive and negative effects of any corrective measures must also be taken into account when determining whether a person is substantially limited in a major life activity. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999). When working is the major life activity impaired due to an alleged disability, a plaintiff must demonstrate that she "was significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998).

Glen has failed to demonstrate a genuine issue of material fact exists as to whether she was substantially limited in her ability to work. While Glen received therapy and medication for her stress and anxiety, the therapy was intermittent; and the medication was not needed or taken on a regular basis. The only restriction on Glen's work activity by her physician was a forty-hour work week. Other than Glen's conclusory allegations that her severe stress and anxiety caused her to "become immobilized, non-responsive, impaired her psychomotor functions, and made her feel very claustrophobic at work," Glen has provided no evidence that she was significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the

10

average person having comparable training, skills, and abilities. Accordingly, Glen has not demonstrated that she is substantially limited in the major life activity of working.[1] *See Scheerer*, 443 F.3d at 919 ("plaintiff must provide specific facts establishing that there is a genuine issue of material fact as to whether [s]he is substantially limited in a major life activity . . . conclusory allegations will not do.").

In the alternative, Glen argues that she is disabled under 42 U.S.C. § 12102(2)(C) because her employer regarded her as having a disability that substantially limited the major life activity of working.

It is not enough for Glen to show that her employer was aware of her impairment; instead, Glen must show that her employer knew of the impairment and believed that she was substantially limited because of it. *See Skorup v. Modern Door Corp.*, 153 F.3d 512, 51 (7th Cir. 1998) (*Skorup*). Accordingly, Glen must show that her employer believed she was unable to work a particular class or broad range of jobs. *See Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 955 n. 7 (7th Cir. 2000); *Skorup*, 153 F.3d at 515.

Glen contends that summary judgment cannot be granted because her supervisors at each of her assigned stations regarded her as being disabled simply because they knew that she had complained of and was receiving treatment for stress and anxiety. However, Glen fails to present evidence that these supervisors believed that Glen was substantially limited because of the stress and anxiety.

---

[1]Contrary to her argument that she was substantially limited in working, Glen argues in the same response brief that any concern her supervisors and managers had about her ability to complete her job were "unwarranted" because she was able to perform her assigned work and did so regularly.

11

Furthermore, as to the adverse employment action of Glen's termination, Glen has failed to demonstrate that she was terminated because of her alleged disability.[2] Glen's termination stemmed from her conduct on January 8, 10 and 12, 2000 (discussed above), which was witnessed by more than one supervisor. Glen's termination for her misconduct was reviewed by an arbitration panel and upheld. Glen fails to present any evidence that she was terminated for reasons other than her January 2000 misconduct.

Based on the above, Glen has failed to establish that she is disabled under the Rehabilitation Act; and her claim fails.

### Retaliation Claim

A *prima facie* case of retaliation requires the plaintiff to demonstrate that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate job expectations, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (*Hilt-Dyson*).

Glen fails to present any evidence of a similarly situated employee who did not engage in statutorily protected activity that was treated more favorably than Glen. In fact, Glen does not even address this element in her response brief. Accordingly, Glen's retaliation claim fails.

---

[2]Glen also alleges other forms of adverse action, specifically, suspension and removal without pay. It has not been shown by facts or the exhibits provided whether these actions constitute an adverse action, i.e., whether Glen lost pay during the suspensions/removals. Accordingly, these claimed adverse actions are not addressed.

12

Lastly, as to the adverse employment action of Glen's termination, as discussed above in regard to Glen's Rehabilitation Act claim, Glen has failed to demonstrate that she was meeting her employer's legitimate employment expectations at the time of her termination; rather, the evidence demonstrates the contrary.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted.

Dated: August 30, 2006

JOHN W. DARRAH
United States District Court Judge